**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION**

| | |
|---|---|
| **STATE OF KANSAS,** *ex rel.* **KRIS W. KOBACH,** Attorney General, | |
| *Plaintiff*, | Case No. 6**:**24-cv-01128 |
| v. | |
| **PFIZER INC.,** | |
| *Defendant.* | |

**PFIZER INC.'s OPPOSITION TO
<u>STATE OF KANSAS'S MOTION TO REMAND</u>**

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................... 1

BACKGROUND ..................................................................................................... 3

ARGUMENT .......................................................................................................... 6

   A. PFIZER IS ENTITLED TO REMOVE THIS ACTION UNDER 28 U.S.C. § 1442(a)(1) ................ 6

      1. Pfizer Acted Under The Direction Of A Federal Officer In Developing And Selling The COVID-19 Vaccine To The Federal Government.................................................. 7

         i. Pfizer's Contract with the Department of Defense Obligated It To Fulfill A Pressing Federal Need............................................................................................ 8

         ii. OAG Distorts The Applicable Law ...................................................... 12

      2. Plaintiff's Claims That Pfizer Made False Statements Regarding The Vaccine Are Connected And Associated With Pfizer's Government Contract To Provide A Safe And Effective Vaccine ........................................................................ 14

      3. Pfizer Has Numerous Colorable Federal Defenses.................................... 17

   B. THE COMPLAINT RAISES FEDERAL QUESTIONS UNDER *GRABLE*, WHICH FURTHER SUPPORTS REMOVAL ......................................................................... 21

      1. Federal Issues Are Necessarily Raised In The Complaint........................... 21

      2. The Federal Issues In the Complaint Are "Actually Disputed," As Required By *Grable* ......................................................................................... 23

      3. These Federal Issues Are Substantial, And Returning This Case To State Court Would Disrupt The State/Federal Balance ............................................ 24

   C. THE PREP ACT COMPLETELY PREEMPTS OAG'S CLAIMS ............................... 25

   D. OAG IS NOT ENTITLED TO ATTORNEYS' FEES ............................................ 29

CONCLUSION...................................................................................................... 29

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aetna Health Inc. v. Davila*,
    542 U.S. 200 (2004)......................................................................................................26, 27

*Berry v. Pfizer, Inc.*,
    No. 24-06857, Dkt. 8 (C.D. Cal. Aug. 26, 2024)...................................................19

*Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*,
    25 F.4th 1238 (10th Cir. 2022) ............................................................................ *passim*

*Becker v. Ute Indian Tribe of the Uintah & Ouray Reservation*,
    770 F.3d 944 (10th Cir. 2014) .............................................................................21

*Belenky v. Kobach*,
    No. 13-4150, 2014 WL 1374048 (D. Kan. Apr. 8, 2014)......................................29

*BHCMC, LLC v. Pom of Kansas, LLC*,
    No. 20-2609, 2022 WL 392291 (D. Kan. Feb. 9, 2022).......................................29

*T.C. ex rel. Cabaniss v. Pfizer Inc.*,
    No. 22-cv-01242, 2022 WL 17578871 (S.D. Cal. Nov. 9, 2022), *aff'd*, No. 23-
    55297, 2024 WL 511872 (9th Cir. Feb. 9, 2024) ................................................19

*Devon Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc.*,
    693 F.3d 1195 (10th Cir. 2012) ...........................................................................25

*Goins v. Saint Elizabeth Med. Ctr., Inc.*,
    No. 22-6070, 2024 WL 229568 (6th Cir. Jan. 22, 2024)................................. *passim*

*Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*,
    545 U.S. 308 (2005).......................................................................................... *passim*

*Gunn v. Minton*,
    568 U.S. 251 (2013)............................................................................................24

*Hurley v. CBS Corp.*,
    648 F. App'x 299 (4th Cir. 2016) ..........................................................................8

*Jackson v. Pfizer, Inc.*,
    No. 24-06708, Dkt. 5 (C.D. Cal. Aug. 22, 2024)..................................................19

*Latiolais v. Huntington Ingalls, Inc.*,
    951 F.3d 286 (5th Cir. 2020) ...........................................................................15, 17

*Maglioli v. Alliance HC Holds. LLC*,
    16 F.4th 393 (3d Cir. 2021) ...........................................................................28

*Maryland v. Soper*,
    270 U.S. 9 (1926)............................................................................................20

*Mayor & City Council of Baltimore v. BP P.L.C.*,
    31 F.4th 178 (4th Cir. 2022) ..........................................................................16

*Mesa v. California*,
    489 U.S. 121 (1989).........................................................................................19

*Metro. Life Ins. Co. v. Taylor*,
    481 U.S. 58 (1987)...........................................................................................25

*Minnesota by Ellison v. Am. Petroleum Inst.*,
    63 F.4th 703 (8th Cir. 2023) ..........................................................................16

*Rhode Island v. Shell Oil Prod. Co.*,
    979 F.3d 50 (1st Cir. 2020), *vacated*, 141 S. Ct. 2666 (2021)...................17

*Ruppel v. CBS Corp.*,
    701 F.3d 1176 (7th Cir. 2012) ..........................................................................8

*Salzer v. SSM Health Care of Oklahoma Inc.*,
    762 F.3d 1130 (10th Cir. 2014) ......................................................................23

*Sawyer v. Foster Wheeler LLC*,
    860 F.3d 249 (4th Cir. 2017) ......................................................................8, 10

*State by Tong v. Exxon Mobil Corp.*,
    83 F.4th 122 (2d Cir. 2023) ............................................................................16

*Texas v. Pfizer, Inc.*,
    Case No. 5:23-cv-00312 (N.D. Tex.)...........................................................2, 29

*Watson v. Philip Morris Co., Inc.*,
    551 U.S. 142 (2007)............................................................................... *passim*

*Willingham v. Morgan*,
    395 U.S. 402 (1969).....................................................................................17, 20

*Winters v. Diamond Shamrock Chem. Co.*,
    901 F. Supp. 1195 (E.D. Tex. 1995), *aff'd*, 149 F.3d 387 (5th Cir. 1998) .......17, 19

*Wolf Creek Nuclear Operating Corp. v. Framatome ANP, Inc.*,
    416 F. Supp. 2d 1081 (D. Kan. 2006)..............................................................29

*Wyoming v. Livingston,*
   443 F.3d 1211 (10th Cir. 2006) ...........................................................................7

**Statutes**

21 U.S.C. § 360bbb-3(c)(2) ..............................................................................15

28 U.S.C. § 1331 ...........................................................................................25, 29

28 U.S.C. § 1441 ...............................................................................................25

28 U.S.C. § 1442(a)(1) ...............................................................................1, 6, 29

28 U.S.C. § 1447(c) ...........................................................................................29

42 U.S.C. § 247d-6d .......................................................................................*passim*

50 U.S.C. § 4557 .......................................................................................2, 17, 19

**Other Authorities**

45 C.F.R. § 101.34(b) .........................................................................................5

45 C.F.R. § 101.70(c) ....................................................................................10, 11

151 Cong. Rec. 30389 (Dec. 18, 2005) ...............................................................18

151 Cong. Rec. 30725 (Dec. 21, 2005) ...............................................................18

85 F.R. 15,198 ............................................................................................18, 27

88 F.R. 30,769 ..................................................................................................27

## INTRODUCTION

The Office of the Attorney General for the State of Kansas ("OAG" or "Plaintiff") alleges Pfizer Inc. ("Pfizer" or the "Company") misled the public about the safety and efficacy of the Company's COVID-19 vaccine: the centerpiece of the federal government's response to an unprecedented national emergency. Initially filed in Thomas County District Court, OAG's Complaint asserts that Pfizer violated Kansas's consumer protection laws, as well historical consent judgments entered in Shawnee County District Court. In reality, however, every aspect of this lawsuit is federal in nature. Both OAG's claims and Pfizer's defenses hinge on substantial questions of federal law. And Pfizer's contract with the U.S. Department of Defense ("DoD") to develop and manufacture a safe an effective COVID-19 vaccine, and sell the first 100 million doses to the federal government, is at the center of the Complaint. Given the federal issues that permeate the Complaint, Pfizer removed the action to this Court. (Dkt. 1.)

OAG now seeks remand, arguing its Complaint raises only state issues that should be resolved in state court. Though OAG's motion attempts to tell a different story, OAG has already conceded on the face of its own Complaint that its claims are intrinsically federal. The Complaint itself raises numerous issues connected to the federal government's contract to develop and purchase a safe and effective vaccine, and goes so far as to allege that Pfizer and the federal government conspired to hide the truth about the vaccine from the American people. (Compl. ¶¶ 360–65.)

The Court should deny the pending remand motion for three distinct reasons. First, Congress, through the federal officer removal statute, expressly legislated that cases like this one are removable to federal court. *See* 28 U.S.C. § 1442(a)(1). Congress passed the federal officer removal statute to protect those working on behalf of the U.S. government from unpredictable and potentially biased state court proceedings, ensuring challenges to federal initiatives are heard in

federal court. *See Watson v. Philip Morris Co., Inc*., 551 U.S. 142, 150 (2007). In fulfilling its obligations under its contract to provide the government with a safe and effective vaccine, Pfizer acted under the direction of a federal officer, and OAG's claims relate to that federally directed conduct. Though OAG's remand motion attempts to question whether Pfizer acted under a federal officer, the Complaint admits as much by alleging a conspiracy between Pfizer and the federal government. (Compl. ¶¶ 360–65.) Pfizer further meets the criteria for federal officer removal because the Company has numerous colorable federal defenses, including that it has immunity under the Public Readiness and Emergency Preparedness Act, 42 U.S.C. § 247d-6d ("PREP Act"), and the Defense Production Act, 50 U.S.C. § 4557 ("DPA"), among many other defenses.

Second, although styled as state-law claims, several of Plaintiff's claims necessarily raise significant federal legal issues, making the entire action removable under *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005). In *Grable*, the Supreme Court recognized that claims like those pled here require "the experience, solicitude and hope of uniformity that a federal forum offers on federal issues." *Id.* at 312. Finally, Congress spoke to the important federal issues implicated in cases like these when it passed the PREP Act, which not only immunizes Pfizer from OAG's claims, but also completely preempts them, further supporting removal to federal court.

OAG's claims are unquestionably federal. They are so obviously federal, in fact, that the Texas Attorney General, when faced with Pfizer's removal of a similar complaint less than a year ago, did not even attempt to seek remand. *See Texas v. Pfizer, Inc.*, Case No. 5:23-cv-00312 (N.D. Tex.). And the U.S. district judge in Lubbock, Texas has retained jurisdiction and allowed the litigation to proceed. As in Texas, this case should remain in federal court.

## BACKGROUND

In the early months of the pandemic, there was no vaccine to protect against COVID-19. To address this urgent and unmet need, the White House launched Operation Warp Speed on May 15, 2020. Because the pandemic had brought the U.S. economy to a standstill and large numbers of people were getting sick and dying from COVID-19, the federal government "refused to accept business-as-usual timelines for vaccines and other essential tools" and pledged, in collaboration with private industry, to "squeeze every last inefficiency out of the process and pour every resource" into an unprecedented effort to produce, among other things, hundreds of millions of doses of COVID-19 vaccines by January 2021.[1] This was an audacious, but necessary, goal; at the time, potential vaccine candidates, including Pfizer's, were still in the early phases of clinical development, and their prospects were uncertain.

As part of Operation Warp Speed, Pfizer entered into an agreement to complete the development of the vaccine and sell it to DoD. (Compl. ¶ 27.) The key terms of this agreement are found in two instruments: (1) a Base Agreement executed on July 20, 2020; and (2) a Statement of Work ("SOW") executed on July 21, 2020. The SOW provides that DoD would purchase 100 million doses of the vaccine at $19.50 per dose, contingent on Pfizer first securing FDA approval or an Emergency Use Authorization ("EUA"). (Compl. ¶ 42.) These agreements were negotiated and signed before Pfizer commenced the placebo-controlled clinical trial of the vaccine, now known as the "landmark study."

Pfizer and its partner, BioNTech, announced initial results from the landmark study, which showed a two-dose regimen of the vaccine conferred 95 percent protection against COVID-19 in

---

[1] U.S. Dep't of Defense, *Immediate Release: Trump Administration Announces Framework and Leadership for 'Operation Warp Speed*,' May 15, 2020, https://tinyurl.com/3yajcvnd.

3

persons 16 years of age and older, in November 2020.  Based on these results, Pfizer and BioNTech asked FDA to authorize the vaccine for emergency use in this age group, and FDA, then under the Trump Administration, issued an EUA on December 11, 2020.  (Compl. ¶ 50.)  In FDA's press release announcing the EUA, the agency touted the vaccine's 95 percent efficacy expressed in terms of relative risk reduction: "Among [trial] participants, 18,198 received the vaccine and 18,325 received placebo.  *The vaccine was 95% effective in preventing COVID-19 disease among these clinical trial participants* with eight COVID-19 cases in the vaccine group and 162 in the placebo group."[2]

Immediately after receiving the EUA, and in accordance with its agreement with the federal government, Pfizer started shipping the first batches of its vaccine to DoD.[3]  The federal government opted to provide the vaccine to the public for free, and the first doses of the vaccine were administered in the U.S. outside of the clinical trial setting on December 14, 2020.[4]

Shortly thereafter, on December 22, 2020, the Trump Administration invoked the DPA and modified its agreement with Pfizer to incorporate a "priority rating" under the Health Resources Priorities and Allocations System ("HRPAS").[5]  (Ex. A; Ex. B.)  In connection with the modification of Pfizer's contract, the U.S. Army Contracting Command explained at the time:

---

[2] U.S. Food & Drug Admin., *FDA Takes Key Action in Fight Against COVID-19 By Issuing Emergency Use Authorization for First COVID-19 Vaccine*, Dec. 11, 2020, http://tinyurl.com/uz84ppkh (emphasis added).

[3] Ben Guarino et al., *'The Weapon That Will End The War': First Coronavirus Vaccine Shots Given Outside Trials In U.S.*, THE WASHINGTON POST, Dec. 14, 2020, https://tinyurl.com/4na9kyby.

[4] Centers for Medicare & Medicaid Servs., *Trump Administration Acts to Ensure Coverage of Life-Saving COVID-19 Vaccines & Therapeutics*, Nov. 13, 2020, http://tinyurl.com/3w9btrdr; U.S. Dep't of Health & Human Sers., COVID-19 Vaccines, https://tinyurl.com/5ftxpcn3.

[5] Sharon LaFraniere and Zach Montague, *Pfizer Seals Deal With U.S. For 100 Million More Vaccine Doses*, N.Y. TIMES, Dec. 23, 2020, https://tinyurl.com/3wk9ps96 ("As part of the deal, the government agreed to invoke the Defense Production Act to help Pfizer get better access to

> As part of a broader strategy to accelerate the development, manufacturing, and distribution of [COVID-19] countermeasures (i.e., vaccines, therapeutics, and diagnostics), Operation Warp Speed (OWS) has been selecting the most promising countermeasure candidates and providing coordinated Government Support . . . The vaccine currently being developed by Pfizer, represents one of the most promising candidates. In order to ensure the success of Pfizer's efforts, a priority rating shall be incorporated into the project agreement . . . .

Ex. A at 1.[6]

Under the above-described modification, Pfizer's agreement with the federal government was given the priority rating "DPA Title I-DO-HR." (Ex. A; Ex. B.) This decision by the federal government to utilize the Defense Production Act allowed Pfizer to receive priority access to key vaccine components and ensured it could "produce and deliver the required quantities of COVID-19 vaccines on [Operation Warp Speed's] proposed accelerated schedule." (Ex. A at 1–2.) On April 14, 2021, General Gustave F. Perna, who served as the chief operating officer of Operation Warp Speed, confirmed that Pfizer's contract was priority-rated "to promote U.S. national defense." (Ex. C.) Equally important, the federal government's application of a DPA Title I DO-HR rating imposed an affirmative requirement on Pfizer to prioritize the delivery of vaccine doses sold through its agreement with the U.S. Army Contracting Command. *See* 45 C.F.R. § 101.34(b); *id.* § 101.70(b), (c).

Throughout most of the pandemic, DoD continued be the exclusive U.S. purchaser of Pfizer's COVID-19 vaccine, which the federal government then distributed to the public free of

---

around nine specialized products it needs to make the vaccine. Under the Korean War-era law, the government can secure critical supplies more quickly by assigning a contract a priority rating, forcing suppliers to bump orders from that contractor to the front of the line.").

[6] As the Tenth Circuit explained in *McPhail v. Deere & Co.*, a district court may consider evidence presented to it after the filing of a notice of removal to determine whether jurisdictional requirements are met. 529 F.3d 947, 956 (10th Cir. 2008).

charge.[7]  Pfizer's vaccine has ultimately proved to be extraordinarily successful, helping turn the tides of the pandemic by slowing the rate of serious illness and saving millions of lives in the United States and around the world.[8]

## ARGUMENT

### A.  PFIZER IS ENTITLED TO REMOVE THIS ACTION UNDER 28 U.S.C. § 1442(A)(1)

Federal officers and their agents may remove cases to federal court based on acts performed under the color of their federal office if they assert a colorable federal defense.  *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1250–51 (10th Cir. 2022).  "Section 1442(a)(1) removal can apply to private persons who lawfully assist federal officers in the performance of their official duties."  *Id.* (quoting *Davis v. South Carolina*, 107 U.S. 597, 600 (1883) (cleaned up)).  The Supreme Court has held that the federal officer removal statute must be "liberally construed" in favor of removal.  *Watson*, 551 U.S. at 147 (citations omitted).

---

[7] Pfizer's vaccine was only recently commercialized to be sold in traditional distribution channels and purchased by private payors.  *See, e.g.*, U.S. Dep't of Health & Human Sers., *Letter From HHS Secretary On COVID-19 Vaccine Coverage*, Sept. 22, 2023, https://tinyurl.com/3nbrfprw (describing efforts to "transition[] COVID-19 vaccines from government distribution to traditional health care distribution channels"); U.S. Dep't of Health & Human Sers., *CMS Administrator Brooks-LaSure Letter to Payors Regarding Coverage of COVID-19 Vaccines Post Commercialization*, July 13, 2023, https://tinyurl.com/2hmjw2xx (describing "the shift away from U.S. Governments purchasing of vaccines to a more traditional commercial market" but noting "that shift has not yet occurred, and the currently authorized and approved COVID-19 vaccines continue to be free").

[8] Francis Collins, *Take It From A Scientist. Facts Matter, And They Don't Care How You Feel*, N.Y. TIMES, Sept. 20, 2024, https://tinyurl.com/2ydtr8ah ("Future historians will judge the development of safe and effective mRNA vaccines for Covid in 11 months as one of the greatest medical achievements in human history.  We felt that at last we were on a path to conquering this disease and stopping the terrible death toll.  And to a major extent, that came true: Current estimates by the Commonwealth Fund, a nonprofit foundation supporting research on health care, are that more than three million lives were saved in the United States between December 2020 and November 2022 by Covid vaccines.").

In enacting the federal officer removal statute, Congress expressed its "determination that 'federal officers, and indeed the [f]ederal [g]overnment itself, require the protection of a federal forum.'" *Wyoming v. Livingston*, 443 F.3d 1211, 1224 (10th Cir. 2006) (quoting *Willingham v. Morgan*, 395 U.S. 402, 407 (1969)). The statute's "basic purpose is to protect against" state attempts to "interfere[] with federal operations" by targeting federal officers and agents and "bring[ing] them to trial in a state court for an alleged state-law offense." *Suncor*, 25 F.4th at 1250–51 (quotation omitted). As the Supreme Court has warned, "[s]tate-court proceedings may reflect 'local prejudice' against unpopular federal laws or federal officials," and it was, accordingly, necessary for Congress to ensure those carrying out federal initiatives have the protection of a federal forum. *Watson*, 551 U.S. at 150 (quotation omitted).

To invoke federal officer removal, a private defendant must show: "(1) they acted under the direction of a federal officer, (2) the claim has a connection or association with government-directed conduct, and (3) they have a colorable federal defense to the claim or claims." *Suncor*, 25 F.4th at 1251 (citations omitted). This case checks all three boxes.

### 1. Pfizer Acted Under The Direction Of A Federal Officer In Developing And Selling The COVID-19 Vaccine To The Federal Government

Pfizer satisfies the first prong of the federal officer removal test by showing that it acted under the direction of a federal officer in developing and selling the COVID-19 vaccine to the federal government pursuant to its DPA-rated order contract. "The words 'acting under' are broad, and . . . must be liberally construed." *Watson*, 551 at 147 (cleaned up). Guided by this principle, the Supreme Court has explained the statutory requirement that a private defendant be "acting under" a federal officer "must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Id.* at 152 (citing *Davis*, 107 U.S. at 600) (emphasis removed). Courts routinely hold that federal government contractors satisfy the "acting under" requirement. *See,*

*e.g.*, *Goins v. Saint Elizabeth Med. Ctr., Inc.*, No. 22-6070, 2024 WL 229568, at *3 (6th Cir. Jan. 22, 2024) ("Moderna counts as a federal officer under § 1442 because of its participation in the Operation Warp Speed vaccine development program."); *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017) ("[T]here can be no question" that a federal contractor that assembled boilers for Naval vessels was "acting under" a federal officer's authority.); *Hurley v. CBS Corp.*, 648 F. App'x 299, 303 (4th Cir. 2016) ("GE is a 'person acting under' a federal officer because it was acting under a valid government contract at all times relevant to the litigation."); *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) (corporate defendant assisting federal government by manufacturing and installing turbines in warships was "person acting under" federal officer).

###### i.    Pfizer's Contract with the Department of Defense Obligated It To Fulfill A Pressing Federal Need

For a government contractor to show it is "acting under" the direction of a federal officer, it must "help federal officers fulfill basic government needs, accomplish key government tasks, or produce essential government products—that is, [the contractor] must stand in for critical efforts the federal superior would need to undertake itself in the absence of a private contract." *Suncor*, 25 F.4th at 1253. Pfizer's contract with the government fits this bill exactly.

The contract itself is explicit that the federal government, utilizing the resources of Operation Warp Speed, contracted with Pfizer to develop an urgently needed vaccine to "combat COVID-19." Dkt. 1-2. The SOW puts it this way:

> On March 13, 2020, the President of the United States declared the COVID-19 outbreak a national emergency. The [g]overnment has identified COVID-19 vaccine candidates that are progressing rapidly through advanced research and development activities. Therefore, ***in response to a request by the [g]overnment***, Pfizer is proposing to manufacture at-scale and fill-finish, ***for provision to the [g]overnment***, a state-of-the-art candidate vaccine….The mRNA vaccine technology [proposed by Pfizer] is []intended to enable quick scale up of production, which is ***critical for bringing a COVID-19 vaccine to market to address this urgent medical need*** while preserving high quality and safety standards.

Dkt. 1-2 at 3–4 (emphasis added).[9]

Through this contract, the federal government asked Pfizer to develop and manufacture an urgently needed, lifesaving vaccine—a far cry from the government "off-the-shelf purchase[s]" discussed in *Suncor*. 25 F.4th at 1253 (citing *Washington v. Monsanto Co.*, 738 F. App'x 554, 555 (9th Cir. 2018)). Although *Suncor* is clear that a run-of-the-mill government contract for a product already sold on the open market may not give rise to federal officer removal, *see id.*, Pfizer's contract with DoD is no such thing. In fact, it is more akin to the "[w]artime production" contracts that *Suncor* described as "the paradigmatic example for th[e] special relationship" giving rise to federal officer removal. *Id.* at 1253. Here, DoD was contracting with Pfizer to purchase a product the federal government desperately needed to combat a raging public health emergency. *See id.* (citations omitted) (emphasizing a government contract "aimed at satisfying pressing federal needs" can satisfy the "acting under" language for removal); (Ex. C (priority rating added to Pfizer contract was necessary "to promote U.S. national defense").) And the vaccine the government sought to purchase *did not even exist* when the contract was inked; Pfizer mobilized extensive resources and efforts to complete the development of a vaccine in record time to meet the government's need and fulfill its contract.[10]

---

[9] OAG complains that the Base Agreement and SOW filed with Pfizer's removal papers contain redactions and, for this reason, should be "construed against Pfizer." (Mot. at 6 & n.3.) These redactions protect only individuals' names and some trade secret information. The material provisions in the Base Agreement and SOW are unredacted, and OAG does not identify any specific concern raised by the redacted text. If the Court believes the unredacted contracts will aid in its resolution of the Motion, Pfizer respectfully requests an opportunity to submit the unredacted versions of the contracts under seal.

[10] OAG takes issue with the fact that Pfizer's contract did not contain any "compulsion" to produce the contracted-for product, such as "threat of criminal sanctions." (Mot. at 11.) Of course, it would be absurd for the government to criminally sanction Pfizer for failing to develop a product that did not previously exist. Furthermore, Plaintiff ignores that, following FDA's initial EUA for the vaccine, Pfizer's agreement with DoD was modified to become a "rated order" contract under the

The SOW also contains detailed specifications for Pfizer's performance of the contract and reporting requirements to facilitate federal monitoring of Pfizer's activities, including:

- "Pfizer shall provide . . . technical reports providing an update of relevant ongoing non-[g]overnment funded activities." (Dkt. 1-2 at 11.)

- "Pfizer shall provide weekly prototype production status reports, including the number of batches produced, doses in the batch, and release status of the finished doses." (*Id.*)

- Requiring Pfizer to provide updates and reports pursuant to a detailed schedule of "deliverables" setting anticipated dates for deliverables to the government. (*Id.* at 12–14.)

- Requiring Pfizer to prepare a Manufacturing Development Plan and a Quality Management Plan. (*Id.* at 14.)

- Detailing the requirements for Pfizer's shipping process, including that "[i]n coordination with the [g]overnment, Pfizer will conduct a demonstration of the shipping process prior to the first delivery of doses at a time mutually agreed by the Parties." (*Id.* at 16.)

This detailed, specific contract between Pfizer and DoD is precisely the type of agreement that constitutes "acting under" the direction of a federal officer. *See Suncor*, 25 F.4th at 1253; *see also Goins*, 2024 WL 229568, at *3 ("Moderna counts as a federal officer under § 1442 because of its participation in the Operation Warp Speed vaccine development program."); *Sawyer*, 860 F.3d at 255 ("[T]here can be no question" that a federal contractor that assembled boilers for Naval vessels was "acting under" a federal officer's authority.). As in *Goins*—which involved the Moderna COVID-19 vaccine—Pfizer's participation in Operation Warp Speed and close

DPA. (*See infra* pg. 5–6.) Failure to timely deliver goods specified in a rated order carries significant penalties and may expose those responsible to criminal liability. *See* 45 C.F.R. § 101.70(c) ("Willful violation of the [DPA] and other applicable statutes, this part, or an official action of HHS is a criminal act, punishable as provided in the DPA and other applicable statutes.").

coordination with the government supports federal officer removal. *Goins*, 2024 WL 229568, at

*3. Like Moderna, Pfizer "worked under the 'direction and control' of the federal government so

that its vaccine would be available quickly." *Id.* (noting under the Moderna government contract,

like Pfizer's, a federal "agency purchased hundreds of millions of doses of the vaccine and (with

two more agencies) coordinated its distribution to retailers").[11]

      To the extent there is any doubt that the agreement between Pfizer and the federal

government creates the type of "special relationship" giving rise to federal officer removal, *Suncor*,

25 F.4th at 1253, the government's modification of the agreement to incorporate a DPA priority

rating resolves it. In receiving a priority rating, Pfizer was obligated, under penalty of criminal

law, to prioritize the government's orders. *See* 45 C.F.R. §101.70(c). And the modification itself

is explicit that Pfizer's ability to "produce and deliver the required quantities of COVID-19

vaccines on [Operation Warp Speed's] proposed accelerated schedule" was a pressing federal

need. (Ex. A; *see also* Ex. C (explaining the priority rating was granted "to promote U.S. national

defense by ensuring [Pfizer's] priority-rated U.S. [g]overnment contracts, as well as their

subcontracts, are appropriately prioritized.").) In satisfying its obligations under its priority rated

contract, Pfizer acted under the direction of a federal officer.

---

[11] OAG argues *Goins* is inapposite because "Pfizer did not join Operation Warp Speed," but Moderna did. (Mot. at 8 & n.5.) OAG is wrong. Unlike Pfizer, Moderna received additional money from Operation Warp Speed to fund its vaccine clinical trials. *Goins*, 2024 WL 229568, at *3. Although Operation Warp Speed did not fund Pfizer's clinical trials, Pfizer's government contract still imposed detailed reporting requirements throughout the clinical trial stage. (*See supra* pg. 10.) And every other aspect of Pfizer's government contract—like Moderna's—flowed through Operation Warp Speed; the contract repeatedly refers to Pfizer's ongoing work as part of Operation Warp Speed and makes clear that the government's purchase of the vaccine was funded through Operation Warp Speed. Dkt. 1-2 at 2, 12, 18-19; Ex. A (priority rating granted to fulfil goals of Operation Warp Speed). Thus, Pfizer clearly participated in Operation Warp Speed. That the government did not fund Pfizer's clinical trials does not change the fact that Pfizer was acting under the direction of a federal officer when it worked to develop a safe and effective vaccine for the government to purchase and help distribute.

### ii.    OAG Distorts The Applicable Law

Because Pfizer's contract with the government clearly supports a finding that Pfizer acted under the direction of a federal officer, OAG misinterprets *Suncor* to invent a legal standard.  (*See* Mot. at 3.)  Rather than citing to the basic standard articulated in *Suncor*, OAG instead creates a six-factor test for determining whether a private entity "acted under" a federal officer.  (*See* Mot. at 3.)  *Suncor* does not articulate such a test.  Rather, the opinion analyzed prior precedent and examined the terms of the contract at issue there.  *Suncor*, 25 F.4th at 1253–54.  OAG now cherry picks certain phrases from that analysis to manufacture a "test" not required by *Suncor*.  The actual *Suncor* test for "acting under" is quite clear:

> [A private entity] must . . . agree to help carry out the duties or tasks of the federal superior under that superior's strict guidance or control.  And this closely supervised work must help federal officers fulfill basic government needs, accomplish key government tasks, or produce essential government products—that is, it must stand in for critical efforts the federal superior would need to undertake itself in the absence of a private contract.

*Id.*  As explained above, Pfizer's contract with DoD was to satisfy an urgent, unmet government need for a safe and effective vaccine in the face of a global public health emergency.  (*Supra* pg. 9–10.)  This falls squarely within *Suncor*'s framework.

Regardless, Pfizer's federal government contract easily satisfies OAG's fabricated test.  As explained above, (1) the contract subjected Pfizer to the government's guidance and control, (2) the contract imposed detailed specifications for Pfizer's performance, (3) the federal government closely monitored Pfizer's compliance with the contract, (4) Pfizer developed a vaccine at the government's request and for the government's use, and (5) once the contract became priority rated, Pfizer was compelled to satisfy the government's urgent need for a vaccine.  (*See supra* pg. 10.)  As to OAG's purported sixth factor—"delegation of legal authority"—*Suncor* explains that this is an alternative means of satisfying the "acting under" element, not a prerequisite

for removal.  *Suncor*, 25 F.4th at 1253.  Regardless, while the contract does not specifically delegate legal authority to Pfizer, the government nevertheless partnered with Pfizer to satisfy a critical federal need.  Nothing more is required.

In attempting to dispute these explicit contractual obligations, OAG mistakenly claims that Pfizer admitted in another litigation that its contract with DoD was limited and did not involve federal government oversight and control.  (Mot. at 4.)  Pfizer made no such admissions, and that litigation is irrelevant to the issues raised here.

In *Jackson*, Pfizer explained the only grounds for the government to ***withhold payment*** under the contract would be withdrawal of FDA's authorization or approval of the vaccine.  (*See* Mot. at 4 (citing *United States ex rel. Jackson v. Ventavia Research Group, LLC*, No. 1:21-cv-00008, ECF 37 (E.D. Tex. Apr. 22, 2022)).)  This is of no consequence to the issues raised here. *Jackson's* discussion of the conditions of payment for delivered doses, made in the context of a motion to dismiss a False Claims Act case under the statue's demanding materiality standard, does not erase the contract's other significant, detailed terms.  The issue here is different—whether Pfizer developed its vaccine in connection with a detailed government contract to satisfy an urgent and unmet federal need.  *See Suncor*, 25 F.4th at 1253 (emphasizing a government contract "aimed at satisfying pressing federal needs" can satisfy the "acting under" language for removal).  This is unquestionably the case.  OAG's attempt to play "gotcha" with Pfizer's briefing in *Jackson* is much ado about nothing.

Plaintiff also incorrectly claims the COVID-19 vaccine was not "specially for the government's use."  (Mot. at 10–11.)  In *Suncor*, the court explained that leases by an oil company "to extract fossil fuels from federal land in exchange for royalty payments" did not amount to "acting under" because the defendant "was not assisting the government with essential duties or

tasks." *Suncor*, 25 F.4th at 1253. The court pointed out that "the leases do not obligate [defendant] to make a product specially for the government's use." *Id.* at 1252. Here, by contrast, Pfizer sold the government an urgently needed product. Far from an "arm's-length business arrangement" supplying "widely available commercial products," as OAG contends, (Mot. at 11), the contract here required Pfizer to develop a new vaccine that did not previously exist and sell that vaccine to the federal government for its use in responding to a public health emergency. And until recently, the federal government was ***the sole*** U.S. purchaser of the vaccine and distributed the vaccine to the U.S. public for free.[12] There are few "essential duties" of the federal government more important than producing a vaccine to protect the health and lives of its citizens in the midst of a national public health emergency, and Pfizer offered invaluable assistance to the government in this critical task. Pfizer's development, sale, and distribution of its vaccine for the federal government pursuant to a government contract is precisely the type of "special relationship" that amounts to acting under a federal officer. *Suncor*, 25 F.4th at 1253.

In satisfying its obligations under its DPA-rated order contract, Pfizer acted under the direction of a federal officer for purposes of federal officer removal, and OAG's arguments to the contrary are not persuasive.

### 2.    Plaintiff's Claims That Pfizer Made False Statements Regarding The Vaccine Are Connected And Associated With Pfizer's Government Contract To Provide A Safe And Effective Vaccine

Pfizer satisfies the second prong of the federal officer removal test, as Plaintiff's claims are connected and associated with Pfizer's actions under the direction of a federal officer. A defendant may remove under Section 1442(a) claims "relating to" the defendant's federally directed actions. Like the "acting under" provision, "the ordinary meaning of the words 'relating to' is a broad one,"

---

[12] *See supra* n.7.

and this clause is liberally construed. *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 291 (5th Cir. 2020) (cleaned up).  To satisfy the "relating to" language in Section 1442(a), a federal officer must show that "the claim has a connection or association with government-directed conduct." *Suncor Energy*, 25 F.4th at 1251 (citing *Latiolais*, 951 F.3d at 296) (other citations omitted).

Here, OAG alleges Pfizer made misleading public statements concerning the COVID-19 vaccine, which (as noted above) the Company manufactured and sold to the federal government as part of Operation Warp Speed.  (*See, e.g.*, Compl. ¶¶ 3–4, 30, 112, 324, 333, 337, 349.)  Each of the statements identified in the Complaint is about the vaccine's safety and efficacy.  (*See, e.g.*, Compl. ¶¶ 92-99; 121–22, 152–53, 206–213, 224–28, 242–46.)  And Pfizer's DPA-rated order contract with the government required it to provide a safe and effective vaccine.  (*See* Dkt. 1-2 at 1–3; *see also* 21 U.S.C. § 360bbb-3(c)(2) (listing the "criteria for issuance" of an EUA, including that, "based on the totality of the scientific evidence," it is "reasonable to believe that the product is effective" and "the known and potential benefits of the product . . . outweigh the known and potential risks").)  Pfizer's safety and efficacy data were provided to FDA, and to DoD under the government contract, and the government has not wavered in its support of the vaccine.  (*See Jackson*, No. 1:21-cv-00008, ECF 137 at 8 (Mar. 12, 2024).)  The Company's statements about the safety and efficacy of the vaccine are, thus, connected and associated with its contract to sell that vaccine to the federal government. *See Goins*, 2024 WL 229568, at *4 (for purposes of federal officer removal, claims for negligence, battery, and negligent hiring were sufficiently "related to" to the COVID-19 vaccine manufactured by Moderna pursuant to its contract with the government as part of Operation Warp Speed).

OAG's argument that "none of Kansas' claims are connected to or associated with conduct directed by the federal government," (Mot. at 16), makes no sense; OAG itself alleges that Pfizer's

statements concerning the vaccine were made in connection with government-directed conduct. For example, Count X alleges that "Pfizer conspired with two or more persons from the federal government . . . to willfully conceal, suppress, or omit material facts relating to Pfizer's COVID-19 vaccine." (Compl. ¶¶ 360–65.) Thus the Attorney General's own Complaint expressly states that Pfizer's "misleading" statements relate to government-directed conduct. It rings hollow for OAG to now attempt to insert daylight between Pfizer and the federal government, when previously Plaintiff referred to them as co-conspirators.

Citing an overturned case out of the First Circuit, OAG argues Pfizer's statements have no "causal nexus" to government-mandated conduct because the contract did not require Pfizer to make false and misleading statements. (Mot. at 15 (citing *Rhode Island v. Shell Oil Prod. Co.*, 979 F.3d 50, 60 (1st Cir. 2020), *vacated*, 141 S. Ct. 2666 (2021)).) But that is contrary to the law in the Tenth Circuit, which has adopted the Fifth Circuit's more liberal "connection or association" test. *See Suncor Energy*, 25 F.4th at 1251 (citing *Latiolais*, 951 F.3d at 296).

Nor are OAG's citations to a string of cases involving oil and gas leases convincing. (Mot. at 14–15.) Those cases involve markedly different contracts—leases to extract natural resources found on federal lands—that did not involve the development and sale of a product necessary for the government to address an urgent federal need. *See Suncor*, 25 F.4th at 1253. And the terms of those leases had no connection whatsoever to the allegedly misleading statements concerning pollution at issue in those cases.[13]

---

[13] *See, e.g.*, *Minnesota by Ellison v. Am. Petroleum Inst.*, 63 F.4th 703, 715 (8th Cir. 2023) ("The Energy Companies' production of military-grade fuel, operation of federal oil leases, and participation in strategic energy infrastructure, even if done at federal direction, bears little to no relationship with how they conducted their marketing activities to the general public."); *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 233 (4th Cir. 2022) (federal leases to extract fossil fuel do not relate to claims concerning defendant's "contribution to climate change"); *State by Tong v. Exxon Mobil Corp.*, 83 F.4th 122, 145 (2d Cir. 2023) (applying the inapplicable "causal

Here, by contrast, OAG is challenging statements Pfizer made about the safety and efficacy of its COVID-19 vaccine, which the Company sold to the federal government pursuant to a DPA-rated order contract requiring Pfizer to provide exactly that: a safe and effective vaccine. Pfizer's statements about the vaccine are inextricably connected to its federal government contract.

### 3.    Pfizer Has Numerous Colorable Federal Defenses

Finally, Pfizer satisfies the third prong of federal officer removal by asserting colorable federal defenses. At this stage, Pfizer need not prove its federal defenses. *Willingham*, 395 U.S. at 407. Rather, a federal defense is colorable if it is "plausible." *Latiolais*, 951 F.3d at 297. Pfizer raised many such defenses in its removal notice, including the PREP Act; the DPA; the Food, Drug, and Cosmetic Act ("FDCA"); the Primary Jurisdiction Doctrine; the First Amendment; the Political Question Doctrine; and Derivative Sovereign Immunity. (Dkt. 1 ¶¶ 29–62.)

OAG argues that some of Pfizer's asserted defenses are not truly "federal." (Mot. at 16.) OAG is wrong; each of the defenses listed above is a federal defense. In particular, Pfizer's PREP Act and DPA defenses both stem from federal statutes. 42 U.S.C. § 247d-6d(a)(1); 50 U.S.C. § 4557. And federal courts have recognized both as providing federal defenses for the purpose of federal officer removal. *E.g.*, *Goins*, 2024 WL 229568, at *3 (holding Moderna's PREP Act immunity was a colorable federal defense in a suit related to its "vaccine that resulted from Operation Warp Speed"); *Winters v. Diamond Shamrock Chem. Co.*, 901 F. Supp. 1195, 1202 (E.D. Tex. 1995) (holding the DPA constituted a "a colorable federal defense" for the purposes of federal officer removal), *aff'd*, 149 F.3d 387 (5th Cir. 1998). And both defenses are colorable here.

---

nexus" test to conclude leases for the extraction of fossil fuels do not relate to claims alleging defendant made misleading statements about pollution); *Shell Oil*, 979 F.3d at 60 (same).

The PREP Act alone provides two different colorable federal defenses. By way of background, Congress passed the PREP Act in response to a "pervasive climate of apprehension" about litigation exposure among vaccine manufacturers that was "chilling the necessary private sector activity." 151 Cong. Rec. 30725, 30727 (Dec. 21, 2005) (statement of Sen. Hatch). Without the nationwide protections enshrined in the PREP Act, "no business model" would allow manufacturers to "take on the tremendous liability risks to produce … [an emergency] vaccine." 151 Cong. Rec. 30389, 30409 (Dec. 18, 2005) (statement of Rep. Deal).

The PREP Act provides Pfizer "immunity from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure." 42 U.S.C. § 247d-6d(a)(1). Pfizer is a "covered person" and Pfizer's COVID-19 vaccine a "covered countermeasure." 85 F.R. 15, 198 (Mar. 17, 2020). And OAG's claims, which explicitly allege the administration or use of Pfizer's vaccine resulted in "damages" to Kansas and its citizens, (Compl. ¶ 343, pg. 68), fall squarely within the PREP Act's expansive definition of "claims for loss." *See* 42 U.S.C. § 247d-6d(a)(2)(A) ("[T]he term 'loss' means *any* type of loss." (emphasis added)).

In addition, the PREP Act preempts OAG's suit against Pfizer by prohibiting state claims "relat[ing] to the design, development, clinical testing . . . manufacture, distribution . . . promotion, . . . [or] any other aspect of and safety or efficacy" of covered countermeasures. 42 U.S.C. § 247d-6d(b)(8)(B). OAG expressly alleges claims challenging the safety and efficacy of the COVID-19 vaccine. Those claims are preempted.

The DPA similarly provides Pfizer immunity from OAG's suit by barring claims "for damages or penalties for any act or failure to act resulting directly or indirectly from compliance

with a rule, regulation, or order issued pursuant to this chapter."  50 U.S.C. § 4557.  To adequately respond to the national emergency of the pandemic, the Trump Administration added a DPA priority rating to its federal government contract with Pfizer.  The government explained that the DPA rating was "to promote U.S. national defense by ensuring [Pfizer's] priority-rated U.S. Government contracts, as well as their subcontracts, are appropriately prioritized."  (Ex. C.)  As OAG's claims targeting Pfizer's actions are claims "for damages or penalties for any act or failure to act resulting directly or indirectly" from Pfizer's compliance with its DPA-rated order contract, the DPA is, at a minimum, a colorable federal defense.  *See Winters*, 901 F. Supp. at 1202 (holding that the DPA is a colorable federal defense for purposes of federal officer removal where the defendant supplied products pursuant to rated order contracts, noting that "[a]lthough a dispute exists as to whether the [DPA] applies to plaintiff's claims, no dispute can exist over the application of this Act as a colorable defense")

Misconstruing the applicable legal standard, OAG urges the Court to disregard these defenses because "Pfizer lacks evidence supporting" them.  (Mot. at 17.)  This is, of course, untrue. *See T.C. ex rel. Cabaniss v. Pfizer Inc.*, No. 22-cv-01242, 2022 WL 17578871, at *2 (S.D. Cal. Nov. 9, 2022) (holding Pfizer "is facially immune from suit in this Court under the PREP Act" and dismissing claims relating to the use of Pfizer's COVID-19 vaccine), *aff'd*, No. 23-55297, 2024 WL 511872 (9th Cir. Feb. 9, 2024); *Jackson v. Pfizer, Inc.*, No. 24-06708, Dkt. 5 (C.D. Cal. Aug. 22, 2024) (dismissing *sua sponte* a *pro se* complaint alleging Pfizer made misrepresentations about its COVID-19 vaccine because Pfizer is immune under the PREP Act); *Berry v. Pfizer Inc.*, No. 24-6857, Dkt. 8 (C.D. Cal. Aug. 26, 2024) (same).  But regardless, for the purpose of removal, "the validity of the defense . . . is a distinct subject," one that "has no connection whatever with the question of jurisdiction."  *Mesa v. California*, 489 U.S. 121, 129 (1989) (quoting *Mayor &*

*Aldermen of Nashville v. Cooper*, 73 U.S. 247, 254 (1867)).  By arguing that Pfizer must prove its defenses at this stage of the litigation, OAG ignores the requirement that a defense need only be "colorable."

OAG contends Pfizer's federal defenses do not support federal officer removal because the government did not order Pfizer to make false and misleading statements.  (*See* Mot. at 17.) Contrary to OAG's assertions, Pfizer is not required to allege that it was directed by the Government to commit "deceptive acts," nor admit that it did so.  The Supreme Court has expressly stated that "[i]t was settled long ago that the federal officer, in order to secure removal, need not admit that he actually committed the charged offenses."  *Willingham*, 395 U.S. at 408-09; *see Maryland v. Soper*, 270 U.S. 9, 32–33 (1926).  OAG's suggestion that Pfizer's federal defenses are not colorable because they do not stem from its official duties is similarly misplaced.  Both the protections of the PREP Act and the DPA flow directly from Pfizer's contract with the government to provide necessary lifesaving countermeasures in a time of emergency.

The PREP Act and the DPA provide not just colorable, but case-dispositive federal defenses to this lawsuit that are more than sufficient to support federal officer removal.

* * *

Pfizer acted under the direction of a federal officer when it satisfied its obligations under its DPA-rated order contract to develop and sell to the government a safe and effective COVID-19 vaccine.  Pfizer's statements concerning the safety and efficacy of that vaccine, which OAG now challenges, are inextricably connected to that federal government contract, and Pfizer has numerous federal defenses to OAG's claims, including (but not limited to) immunity under the PREP Act and the DPA.  Pfizer satisfies each element of federal officer removal, and this Court should deny OAG's motion to remand on this basis alone.

## B.    THE COMPLAINT RAISES FEDERAL QUESTIONS UNDER *GRABLE*, WHICH FURTHER SUPPORTS REMOVAL

Removal of OAG's Complaint was also appropriate under the Supreme Court's decision in *Grable*. Under *Grable,* a complaint may be removable if, like the present action, any of the state law claims necessarily raise a federal question "actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314. In affirming the removal of state law claims in *Grable*, the Supreme Court held "a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude and hope of uniformity that a federal forum offers on federal issues." *Id.* at 312.

Consistent with *Grable*, the Tenth Circuit has held that federal jurisdiction over a state law claim will lie if a federal issue is: "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Becker v. Ute Indian Tribe of the Uintah & Ouray Reservation*, 770 F.3d 944, 947 (10th Cir. 2014) (quoting *Gunn v. Minton*, 568 U.S. 251, 258 (2013)). Unlike federal officer removal—which is interpreted broadly—*Grable* is a narrower exception to the well-pleaded complaint rule. This unique lawsuit concerning the federal government's response to a nationwide public health emergency satisfies the requirements for *Grable* removal.

### 1.    Federal Issues Are Necessarily Raised In The Complaint

Counts I, II, III, and IV of the Complaint each allege violations of prior consent judgments between Pfizer and the State of Kansas in 2008, 2012, and 2014.[14] Each of the at-issue consent

---

[14] These consent judgments, which related to historic Pfizer products and were entered into years prior to the development of Pfizer's vaccine, do not apply to statements about Pfizer's vaccine.

judgments include prohibitions on false or misleading statements about Pfizer products, (Compl. ¶¶ 294, 306, 315), but these judgments also exempt Pfizer statements that are consistent with or required by federal law.  For example, the 2014 consent judgment provides that it "shall in no way be construed to prohibit Pfizer from making representations with respect to any Pfizer product that are required under [f]ederal law or regulations or in [FDA] approved [l]abeling" and that "[n]othing in this [j]udgment shall require Pfizer to (a) take any action that is prohibited by the [FDCA] or any regulation promulgated thereunder, or by the FDA; or (b) fail to take any action that is required by the FDCA or any regulation promulgated thereunder, or by the FDA."  (Compl. Ex. E., ¶¶ 1.11, 1.12.)  And the 2014 judgment goes on to state:

> Any written or oral [p]romotional claim subject to this [j]udgment which is the same, or materially the same, as the language required or agreed to by [FDA's] Director of the Office of Prescription Drug Promotion, the Director of the Advertising and Promotional Labeling Branch, the Director of the Center for Drug Evaluation and Research, or the Director of the Center for Biologics Evaluation and Research, or their authorized designees in writing shall not constitute a violation of this [j]udgment, unless facts are or become known to Pfizer that cause the claim to be false, misleading, or deceptive.

(*Id.*)  The 2008 and 2012 consent judgments both contain substantially the same exemptions. (Compl. Ex. A ¶ 6, Ex. D ¶ 1.8.)

The consent judgments, on their face, raise a federal issue—whether Pfizer's public statements were in compliance with the FDCA and FDA guidance.  Although OAG claims issues relating to FDA guidance and approval are "entirely irrelevant" to its consumer protection claims, (Mot. at 20), the Court cannot resolve whether Pfizer violated the consent judgments—and thus cannot resolve Counts I through IV—without addressing Pfizer's compliance with the FDCA and

---

For purposes of this motion only, Pfizer assumes as true OAG's assertion that these judgments apply.

FDA guidance.[15]  Nor does OAG's claim that it may prevail on "alternative theories," (Mot. at 21), hold water.  The consent judgments themselves include provisions requiring the resolution of federal issues; there can be no other alternative theory for violation of those judgments.

Similarly, Count X alleges Pfizer and the U.S. Department of Health & Human Services ("HHS") engaged in a conspiracy to willfully mislead the public about the safety and efficacy of the COVID-19 vaccine.  Now, in an effort to avoid *Grable*, OAG argues FDA did not authorize Pfizer to make misleading statements.  (*See* Mot. at 22.)  But OAG's own Complaint says the opposite, accusing Pfizer and HHS of conspiring to mislead the public.  Adjudicating this serious claim—that federal officials themselves illegally conspired to mislead the American public—will require the Court to evaluate federal officials' behavior and necessarily raises federal legal issues.

### 2. The Federal Issues In the Complaint Are "Actually Disputed," As Required By *Grable*

In filing claims for violations of the consent decrees, it is apparent OAG disputes that Pfizer complied with FDA guidance.  In reality, however, Pfizer will demonstrate that its statements concerning the COVID-19 vaccine's safety and efficacy are consistent with and/or required by federal law.  Indeed, in some instances, the statements OAG challenges were identical to FDA's own statements about the vaccine.[16]  And Pfizer vehemently denies that it conspired with federal

---

[15] To the extent OAG argues its claims under the Kansas Consumer Protection Act (Counts V through IX) do not raise federal issues, only one count must fall within *Grable* to remove the entire complaint.  *See Suncor*, 25 F.4th at 1254 ("A defendant can remove an action provided at least one claim falls within original federal jurisdiction." (citations omitted)); *Salzer v. SSM Health Care of Oklahoma Inc.*, 762 F.3d 1130, 1138 (10th Cir. 2014) ("[F]ederal jurisdiction over any one claim is sufficient to support removal." (citations omitted)).

[16] To take just one example, FDA's own press release announcing authorization of the Pfizer vaccine stated the vaccine was 95% effective, a claim OAG asserts was misleading when made by Pfizer.  *See supra* n.2; (Compl. ¶¶ 206–07.)

government officials to mislead the American public.  Accordingly, the disputes regarding federal issues here are very real.

### 3. These Federal Issues Are Substantial, And Returning This Case To State Court Would Disrupt The State/Federal Balance

"The substantiality inquiry under *Grable* looks . . . to the importance of the issue to the federal system as a whole." *Gunn*, 568 U.S. at 260.  And *Grable* instructs courts to consider "the appropriate 'balance of federal and state judicial responsibilities.'" *Id.* at 264 (quoting *Grable*, 545 U.S. at 314).  OAG's Complaint raises the question of whether a state may challenge the federal government's policy response to a national emergency.  In particular, the Complaint seeks to hold Pfizer liable for statements it made concerning the COVID-19 vaccine that were accurate and consistent with federal guidance.  And OAG labels the coordination between the federal government and Pfizer to roll out the COVID-19 vaccine as an illegal conspiracy to mislead the American people.

In short, OAG seeks to upend principles of federalism by using a state court proceeding to challenge federal decisions made during a national emergency.  The federal questions raised in this case—including whether a corporation assisting the federal government in addressing a national public health emergency can violate state law when complying with the federal government's directives under such exigent circumstances—are substantial questions with broad implications for the balance of state and federal power in our judicial system.  These claims challenging the validity of federal actions demand "the experience, solicitude and hope of uniformity that a federal forum offers on federal issues." *Grable*, 454 U.S. at 312; *cf.  Watson*, 551 U.S. at 150 ("State-court proceedings may reflect 'local prejudice' against unpopular federal laws or federal officials.").

OAG argues the federal issues raised in its Complaint are unimportant because "Congress

has not created a federal cause of action that Kansas could have pursued based on Pfizer's misconduct." (Mot. at 25.) This argument conveniently ignores that cases like this one are *so important* to the federal government that Congress passed the PREP Act and the DPA to expressly provide immunity to companies like Pfizer that assist the federal government in times of national crisis. (*See supra* pg. 18–19.) And state lawsuits like this one are the precise reason Congress drafted the federal officer removal statute to ensure challenges to federal policies are heard in federal court. *See Watson*, 551 U.S. at 147–50.

This action raises significant federal issues regarding the legality of statements the federal government and its agent, Pfizer, made while working to combat a once-in-a-century public health emergency. These are quintessential federal issues that are appropriately resolved in federal court. Allowing this case to return to state court would be inconsistent "with congressional judgment about the sound division of labor between the state and federal courts." *Grable*, 545 U.S. at 313. This Court should follow *Grable* and deny OAG's motion to remand this important federal case.

## C.    THE PREP ACT COMPLETELY PREEMPTS OAG'S CLAIMS

The Court may also deny OAG's motion to remand because the claims in the Complaint are completely preempted by the PREP Act and are thus removable to federal court. *See* 28 U.S.C. §§ 1331 and 1441. The doctrine of complete preemption is an exception to the well-pleaded complaint rule, providing that "Congress may so completely pre-empt a particular area that any civil complaint raising this select group of claims is necessarily federal in character" and thus removable to federal court. *Metro. Life Ins. Co. v. Taylor,* 481 U.S. 58, 63–64 (1987). "[F]or the complete-preemption doctrine to apply, the challenged claims must fall within the scope of federal statutes intended by Congress completely to displace all state law on the given issue and comprehensively to regulate the area." *Devon Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1205 (10th Cir. 2012) (quotation omitted).

To determine whether a state-law claim is completely preempted by federal law, the Tenth Circuit applies a two-step analysis: "first, we ask whether the federal question at issue preempts the state law relied on by the plaintiff; and second, whether Congress intended to allow removal in such a case, as manifested by the provision of a federal cause of action." *Suncor*, 25 F.4th at 1256. When these factors are met, a state-law claim is completely preempted (i.e., removable) if the plaintiff "could have brought" the claims under the federal cause of action. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004).

The PREP Act expressly and completely preempts the claims raised in the Complaint, while at the same time providing an exclusive federal forum for claims seeking to impose civil liability on the manufacturers of COVID-19 vaccines and other pandemic-related countermeasures. In addition to providing immunity from suit, the PREP Act also expressly preempts state laws and claims attempting to impose liability related to covered countermeasures:

> During the effective period of a declaration under subsection (b), or at any time with respect to conduct undertaken in accordance with such declaration, no State or political subdivision of a State may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that—
>
> (a) is different from, or is in conflict with, any requirement applicable under this section; and
>
> (b) relates to the design, development, clinical testing or investigation, formulation, manufacture, distribution, sale, donation, purchase, marketing, promotion, packaging, labeling, licensing, use, any other aspect of safety or efficacy, or the prescribing, dispensing, or administration by qualified persons of the covered countermeasure, or to any matter included in a requirement applicable to the covered countermeasure under this section or any other provision of this chapter, or under the Federal Food, Drug, and Cosmetic Act.

42 U.S.C. § 247d-6d(b)(8).

The PREP Act also creates "an exclusive Federal cause of action against a covered person for death or serious physical injury proximately caused by willful misconduct." 42 U.S.C. § 247d-

6d(d)(1). The U.S. District Court for the District of Columbia has "exclusive federal jurisdiction" over any action brought pursuant to 42 U.S.C. § 247d-6d(d)(1). *See* 42 U.S.C. § 247d-6d(e).

The federal government agrees; on January 8, 2021, HHS issued an Advisory Opinion which states the "PREP Act is a 'Complete Preemption' Statute."[17] This Advisory Opinion explains "[t]he *sine qua non* of a statute that completely preempts is that it establishes either a federal cause of action . . . as the only viable claim or vests exclusive jurisdiction in a federal court. The PREP Act does both."[18]

The PREP Act, accordingly, applies to completely preempt the claims here. As previously discussed, Pfizer's COVID-19 vaccine is a "covered countermeasure" and the Company is a "covered person" under the PREP Act, as stated in the HHS Secretary's initial PREP Act declaration dated March 17, 2020, 85 F.R. 15,198, and the numerous renewals of and amendments to that declaration, through and including the Secretary's most recent declaration dated May 12, 2023, 88 F.R. 30,769. In addition, the Complaint asserts Pfizer acted "willfully" when it allegedly misrepresented the vaccine's safety and efficacy in violation of Kansas law. (Compl. ¶¶ 349, 353, 361, 364.) Plaintiff's claims fall within the scope of the PREP Act's preemption provision, and OAG's claims for willfulness could only have been brought pursuant to the PREP Act's sole exception. *See* 42 U.S.C. § 247d-6d(b)(8), (d)(1). Both prongs of the Tenth Circuit's test for complete preemption are, accordingly, satisfied. *Aetna*, 542 U.S. at 210.

OAG disputes removal under the complete preemption doctrine, pointing to case law prohibiting residential care facilities from removing state-law negligence and wrongful death

---

[17] *See* Dep't of Health & Human Servs., *Advisory Opinion 21-01 on the Public Readiness & Emergency Preparedness Act Scope of Preemption Provision*, Jan. 8, 2021, https://tinyurl.com/5n8yh4dd.

[18] *Id.*

claims stemming from the COVID-19 pandemic.  (*See* Mot. at 27–28.)  These cases, which do not involve claims for willful misconduct, are a far cry from the case at bar.  Indeed, in one such case, the Third Circuit explained "[w]e do *not* hold that all state-law causes of action are invulnerable to complete preemption under the PREP Act" because some claims could fall within the willful misconduct provision.  *Maglioli v. Alliance HC Holds. LLC*, 16 F.4th 393, 412–13 (3d Cir. 2021) (emphasis added).

OAG argues "even though the Petition may contain the word 'willful,'" its claims do not fall within the PREP Act's federal cause of action because the Complaint "has not alleged injuries from 'death or physical injury.'"  (Mot. at 28–30.)  But the Complaint details at length OAG's apparent belief that the COVID-19 vaccine is unsafe and physically injured recipients, (Compl. ¶¶ 92–205), and OAG expressly claims that Pfizer's conduct in allegedly concealing this information was "willful."  (Compl. ¶ 56 ("Pfizer has willfully concealed, suppressed, and omitted safety . . . data relating to its COVID-19 vaccine.").)  These claims fall squarely within the PREP Act's standard for willfulness.  *See* 42 U.S.C. 247d-6d(c)(1)(A) ("[A]n act or omission that is taken—(i) intentionally to achieve a wrongful purpose; (ii) knowingly without legal or factual justification; and (iii) in disregard of a known or obvious risk that is so great as to make it highly probable that the harm will outweigh the benefit.").

The claims raised in the Complaint fall within the PREP Act's protections for the manufacturers of COVID-19 vaccines and other countermeasures, and OAG's claims could only have been brought, if at all, pursuant to the "exclusive Federal cause of action" established in 42 U.S.C. § 247d-6d(d)(1).  Accordingly, Plaintiff's claims are completely preempted and removable to federal court.  *See Suncor*, 25 F.4th at 1256.

### D.    OAG Is Not Entitled to Attorneys' Fees

OAG seeks attorneys' fees under 28 U.S.C. § 1447(c), claiming Pfizer "lacked an objectionably reasonable basis for removal." (Mot. at 30.)  OAG is wrong.  As explained above, there is significant statutory and precedential support for Pfizer's removal arguments.  Indeed, Pfizer's grounds for removal are so strong that the Texas Attorney General did not even attempt to remand a similar case against Pfizer, which the Company removed to federal court on the same grounds.  *See Texas v. Pfizer, Inc.*, Case No. 5:23-cv-00312 (N.D. Tex.).  It accordingly cannot be said that Pfizer "lacked an objectively reasonable basis for removal."  *Belenky v. Kobach*, No. 13-4150, 2014 WL 1374048, at *4 (D. Kan. Apr. 8, 2014) (denying fees where, although motion to remand was granted, a similar case was proceeding in federal court and "there [was] a reasonable possibility that this case could involve interpretation of federal law"); *Wolf Creek Nuclear Operating Corp. v. Framatome ANP, Inc.*, 416 F. Supp. 2d 1081, 1090 (D. Kan. 2006) (denying fees because "[t]here is some clear authority outside this jurisdiction" supporting defendant's removal argument).  In addition, OAG has failed to comply with D. Kan. Rule 54.2 regarding this request, which further supports denial.  *See, e.g.*, *BHCMC, LLC v. Pom of Kansas, LLC*, No. 20-2609, 2022 WL 392291, at *5 (D. Kan. Feb. 9, 2022). OAG's request for fees is frivolous and should be denied.

### CONCLUSION

OAG's claims against Pfizer are undeniably federal.  Pfizer's key defenses are rooted in federal law.  Most importantly, Pfizer's DPA-rated order contract to assist the federal government in providing a safe and effective vaccine to the public in the face of a global pandemic is at the heart of this lawsuit.  This case belongs in federal court.  This Court, accordingly, should deny OAG's motion to remand and retain this proceeding pursuant to 28 U.S.C. §§ 1331 and 1442(a)(1).

October 21, 2024

Respectfully submitted,

*/s/ Dane C. Martin*

Andrew J. Hoffman II
Admitted *pro hac vice*
Andrew.Hoffman@dlapiper.com
**DLA Piper LLP (US)**
2000 Avenue of the Stars
Suite 400, North Tower
Los Angeles, CA 90067
Telephone:  310.595.3000

Meagan D. Self
Admitted *pro hac vice*
Meagan.Self@dlapiper.com
**DLA Piper LLP (US)**
1900 North Pearl Street
Suite 2200
Dallas, TX 75201
Telephone: 214.743.4500

Lianna Bash
Admitted *pro hac vice*
Lianna.Bash@dlapiper.com
**DLA Piper LLP (US)**
701 Fifth Avenue
Suite 6900
Seattle, WA 98104
Telephone:  206.839.4000

Dane C. Martin
Kansas Bar No. 25560
dmartin@spencerfane.com
**Spencer Fane LLC**
1000 Walnut Street
Suite 1400
Kansas City, Missouri 64106
Telephone: (816) 474.8100

Carlton E. Wessel
Admitted *pro hac vice*
Carlton.Wessel@dlapiper.com
**DLA Piper LLP (US)**
500 Eighth Street, NW
Washington, D.C. 20004
Telephone:  202.799.4000

30

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 21, 2024, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on all counsel for all parties who have entered in the case.

<u>*/s/ Dane C. Martin*    </u>
Dane C. Martin